**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION**

| | | |
|---|---|---|
| **CERNER CORPORATION,** | ) | |
| | ) | |
| **Plaintiff/Counter-Defendant,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 04-1033-CV-W-GAF** |
| | ) | |
| **VISICU, INC.,** | ) | |
| | ) | |
| **Defendant/Counterclaimant.** | ) | |

## <u>ORDER</u>

Now pending before the Court are six separate Motions for Summary Judgment concerning various issues present in this patent infringement case.[1]  (Doc. ##230, 232, 237, 241, 244, 269). After extensive briefing by the parties and careful consideration by the Court, Plaintiff/Counter-Defendant Cerner Corporation's ("Cerner") Motion regarding non-infringement (Doc. #269) is DENIED; Cerner's Motion regarding invalidity (Doc. #244) is DENIED; Cerner's Motion regarding intervening rights (Doc. #237) is GRANTED; Cerner's Motion regarding willful infringement (Doc. #241) is DENIED; Cerner's Motion regarding misappropriation of trade secrets (Doc. #230) is GRANTED in part and DENIED in part; and Defendant/Counterclaimant Visicu, Inc.'s ("Visicu") Motion regarding no inequitable conduct (Doc. #232) is DENIED.

---

[1]Also pending are three Motions to Strike certain declarations, affidavits, and expert testimony and reports submitted in support of the pending Motions for Summary Judgment. (Doc. ##254, 261, 292).  For purposes of its consideration of the issues addressed in this Order, the Court will treat the facts that rely on the challenged evidence as disputed and reserves ruling on the Motions to Strike until trial.

1

I.      Facts

A.      *Procedural History*

Cerner initiated the instant action on November 12, 2004, seeking declarations that (1) it had not infringed and is not infringing Visicu's United States Patent No. 6,804,656 ("the '656 patent"), either directly or contributorily; (2) the '656 patent is invalid; (3) the '656 patent is unenforceable due to patent misuse and/or inequitable conduct; and (4) Visicu engaged in unfair competition and tortious interference with Cerner's contracts and business expectancies. (Doc. #1). Two months later, Cerner filed its First Amended Complaint, seeking identical relief. (Doc. #14). On October 23, 2005, Visicu answered and asserted the following counterclaims: (1) Patent Infringement; (2) Inducement of Patent Infringement; (3) Contributory Patent Infringement; (4) Trade Secret Misappropriation; (5) Breach of Contract; (6) Unfair Competition under the Lanham Act; (7) Common Law Unfair Competition; (8) Injurious Falsehood; and (9) Tortious Interference with Contract and Business Expectancy. (Doc. #57). On December 6, 2005, the Court stayed the case pending reexamination of the '656 patent by the United States Patent and Trademark Office ("PTO") and, approximately two years later, the stay was lifted . (Doc. ##91, 103-04).

On January 7, 2008, Cerner filed its Second Amended Complaint, requesting additional declarations that it did not infringe Visicu's United States Patent No. 7,256,708 ("the '708 patent") and that the '708 patent is invalid and/or unenforceable. (Doc. #116). Twenty-one days later, Visicu answered and amended its counterclaims to add claims of infringement, both direct and contributory, of the '708 patent. (Doc. #117). On July 10, 2008, the Court held the *Markman* hearing and then issued its Claim Construction Order on July 23, 2008. (Doc. ##134-35).

2

On May 15, 2009, Cerner filed its Third Amended Complaint with leave from the Court, asserting additional allegations of inequitable conduct. (Doc. #204). Cerner filed its Fourth Amended Complaint on July 28, 2009, dropping its unfair competition and tortious interference claims. (Doc. #252). Thereafter, Visicu abandoned its breach of contract, unfair competition, injurious falsehood, and tortious interference claims. (Doc. #253).

## B.    *Factual Background*

In 1998, Drs. Brian A. Rosenfeld and Michael Breslow founded Visicu for the purpose of developing and distributing an intensive care unit ("ICU") system to assist clinicians with the monitoring and management of ICU patients. (Henkind Rpt., ¶¶19, 21). Visicu's ICU solution, the eICU remote monitoring system, featured both remote monitoring capabilities and clinical decision support (e.g. clinical content, algorithms, decision flowcharts, etc.) to help clinicians make decisions and guide care. *Id.* at ¶21. Visicu installed its first system in 2000. *Id.* at ¶19.

Cerner's ICU product is built around a core module called INET, which was first installed in 1999. (Henkind Rpt., ¶25). INET, as it stood prior to 2001, has been described as "weak," "inadequate for the critical care market space," and consisting of only "a nursing documentation system." (CERN057223-27; Fackler Depo., 15:7-12).

In the Spring of 2001, Visicu and Cerner commenced discussions regarding a possible partnership between the two parties, wherein Visicu's eICU remote monitoring system, then known as Argus, would be built upon Cerner's existing architecture. (Bowerman Depo., 36:19-37:6; Super Depo., 133:3-19; VIS0212261-62, 69, 76-79). While the partnership never came to fruition, Visicu and Cerner exchanged information regarding their respective systems, including the Gap Analysis and the Future Feature List documents. (Gap Analysis; Future Features List). Some of this

3

information was or became public. (Henkind Depo., 132:7-24). Following the discussions, Cerner identified some features of Visicu's eICU remote monitoring system as "key" or "significant." (CERN017059; CERN010464-66).

Visicu attempted to keep detailed information about its product confidential. It was standard operating procedure at Visicu for contractors to sign a non-disclosure agreement prior to being shown any Visicu confidential information. (Bowerman Depo., 201:2-202:15). In fact, the discussions between Visicu and Cerner were covered by two confidentiality agreements, executed on April 18, 2001, and January 23, 2002. (4/18/01 Non-Disclosure Agreement ("NDA"); 1/23/02 NDA). Additionally, Visicu's technology team would not provide lists of features or screen shots of its eICU remote monitoring system without a confidentiality agreement in place and did not send electronic user manuals to its clients for fear of dissemination to individuals not under a NDA. (Bowerman Depo., 182:21-184:9). Visicu asserts that at all sales presentations in which purported confidential information was revealed, potential customers were required to sign a NDA. (Rosenfeld Depo., 295:15-296:20, 297:11-298:14; Doerfler Depo., 269:1-273:6).

Nevertheless, some information did become publicly available despite Visicu's practices to keep information confidential. A sales power-point presentation, which included screen shots, was available on the Internet beginning in 2004. (Internet Archive Wayback Machine, http://web.archive.org/web/20041011195036/http://www.nocalhimss.org/new/presentations/100 40511_Meyers.pdf).[2] Additionally, Visicu's December 28, 2000, Patent Cooperation Treaty ("PCT") Application disclosed certain concepts of its eICU remote monitoring system. (Henkind

---

[2]On or about September 15, 2009, the Internet address for the presentation was still active. However, when attempting to revisit the site on October 22, 2009, the presentation was no longer available.

Depo., 225 13:227-:, 228:1-7, 228:19-24, 230:11-22; PCT App. WO 00/79466). Visicu also conducted public trade show demonstrations of its ICU solution at conferences without requiring potential buyers to sign a NDA. (Larsen Depo., 73:4-75:24, 76:23-77:21, 78:22-79:1; 80:23-81:3, 81:21-82:11). Furthermore, Visicu permitted CNN and a local broadcast station to publicly broadcast a news story about its eICU remote monitoring system, which disclosed elements listed in the Gap Analysis. (IC-USA video).

In 2004, Cerner installed its first ICU remote monitoring solution, named INET Virtual,[3] at Borgess Medical Center ("Borgess"). (Valentine Deposition ("Depo"), 60:14-25). In its negotiations with Borgess, Cerner obligated itself to build a system providing "'like for like' functionality to the Visicu virtual monitoring solution" then in place at Borgess. (BOR007462-64; CERN011672-73; CERN069218). Cerner also agreed to indemnify Borgess for breaking its contract with Visicu. (Valentine Depo., 41:16-43:1; Anderson Depo., 23:3-7).

## C.    *The '656 Patent*

On November 18, 1999, Visicu's co-founders, Drs. Rosenfeld and Breslow, applied for the '656 patent for a "system and method for providing continuous, expert network critical care services from a remote location(s)." ('656 Patent, p. 1). Visicu alleges Cerner has infringed and is infringing claims 17 and 20 through 26 of this patent. (V5SRI,[4] ¶1). Claim 17 of the '656 patent is an independent claim and claims 20 through 26 depend upon claim 17. ('656 Patent).

During the original prosecution of the '656 patent, the examiner rejected Visicu's claims as unpatentable over prior art. (5/13/04 Supp. Resp. To Office Action, p. 22). In response to those

---

[3]INET Virtual is also called "Virtual ICU" and "VICU."

[4]Visicu's Fifth Supplemental Response to Interrogatories

5

rejections, Visicu cancelled the pending claims and submitted new independent claim 46,[5] which included the elements of original claim 25 and added the limitation "the remote command center comprising a database and a workstation." (Wade Rpt., p. 179; 5/13/04 Supp. Resp. To Office Action, p. 22). In submitting its new claims, Visicu distinguished the prior art on the ground that it involved analysis of data by a human operator or observer, not a computerized rules engine. (5/13/04 Supp. Resp. To Office Action, p. 10-23).

The '656 patent issued on October 12, 2004. *Id.* at p. 1. Subsequently, the PTO granted an ex parte request for reexamination on January 25, 2005. (Jan. 2005 Ex Parte Reexamination Request). Following this reexamination request, the PTO rejected claims 17 and 21 through 26 "as being anticipated by Schoenberg et al. (WO 98/29790)" and claim 20 "as being unpatentable over Schoenberg et al. (WO98/29790) in view of David et al. (US 5,544,649)." (Nov. 2005 Office Action, ¶¶2, 4). On December 6, 2005, Visicu's patent attorney, Dr. Jon Roberts, and three PTO examiners met to discuss the '656 patent. (Dec. 2005 Interview Summary). Following this discussion, the examiners stated that the prior art "can be overcome by amending claims 1 and 17 to clarify that the analysis of the patient data elements takes place 'continuously'" and "can be overcome by clarifying that the rules engine is applied to the [sic] at least two patient data elements in order to search for 'patterns of data' indicative of the patient's condition." *Id.* at p. 2.

In response to the Office Action and in accordance with the December 6, 2005, meeting, Visicu amended[6] claim 17 as follows:

---

[5]Renumbered as claim 17.

[6]Additions shown by underline, deletions shown by strikethrough.

6

17.     (Amended) A method for providing expert critical care simultaneously to a plurality of geographically dispersed intensive care units (ICUs) from a remote location comprising:

> monitoring patient data elements of patients in a plurality of geographically dispersed ICUs;

> communicating over a network the monitored patient data elements to a remote command center, the remote command center comprising a database and a workstation;

> storing the monitored patient data elements in the database, wherein the database comprises stored patient data elements;

> applying a rules engine <u>continuously</u> to at least two patient data elements stored in the database to <u>search for patterns of data indicative of the medical condition of a patient</u> ~~monitor the medical condition in the patients~~; and

> utilizing the output from the rules engine to determine if intervention is warranted; and

> wherein the monitoring and determining if intervention is warranted for individual patients <u>is directed from the remote command center</u> ~~occurs~~ 24 hours per day 7 days per week.

(Jan. 2006 Resp. To Office Action, p. 6).  In its Notice of Intent to Issue Ex Parte Reexamination Certificate, the PTO stated, in part, that the "patent owner has amended independent claims 1 and 17 to define over the cited prior art patents and printed publications."  (Mar. 2006 Notice of Intent to Issue Ex Parte Reexamination Certificate, p. 4).  The PTO then issued Visicu its first Ex Parte Reexamination Certificate on September 26, 2006, stating that this was "keeping with the agreement reached at the interview held on 06 December 2005."  ('656 C1).

On January 12, 2007, the PTO granted a second request for reexamination of the '656 patent. (Jan. 2007 Ex Parte Reexamination Request).  Upon this reexamination, the PTO rejected claims 17 and 20 through 26 "as being unpatentable over Schoenberg et al. (WO98/29790) in view of Kohane

7

et al."[7] and "further in view of David et al. (US 5,544,649)." (Feb. 2007 Office Action, ¶¶2, 4).

In response to this second rejection, Visicu further amended claim 17 as follows:

> 17. (Currently Amended) A method for providing expert critical care simultaneously to a plurality of geographically dispersed intensive care units (ICUs) from a remote location comprising:
>
>> monitoring patient data elements of patients in a plurality of geographically dispersed ICUs;
>>
>> communicating over a network the monitored patient data elements to a remote command center, the remote command center comprising a database and a workstation;
>>
>> storing the monitored patient data elements in the database, wherein the database comprises stored patient data elements;
>>
>> applying a rules engine continuously to at least two patient data elements stored in the database to search for patterns of data indicative of the medical condition of a patient; and
>>
>> utilizing ~~the~~ an output from the rules engine to determine if intervention is warranted; and
>>
>> wherein the monitoring and determining if intervention is warranted for individual patients ~~is directed from~~ occurs in an automated fashion at the remote command center 24 hours per day 7 days per week.

(Feb. 2007 Resp. To Office Action, p.6). In proposing this amendment, Dr. Roberts stated to the PTO that "[c]laims 1 and 17 have been amended to further clarify that the monitoring and intervention functions of the claimed embodiments are automated." *Id.* at p. 10. On June 12, 2007, the PTO found claim 17 was patentable as amended because it "had been amended to overcome the prior art rejections set forth in this reexamination proceeding." (June 2007 Notice of Intent to Issue

---

[7] *Hypothesis-Driven Data Abstraction with Trend Templates*, Proceedings of Seventeenth Annual AMIA Annual Symposium on Computer Applications in Medical Care, October 30-November 3, 1993.

8

Ex Parte Reexamination Certificate, p. 2). The PTO further noted claims 20 through 26 were also "patentable because of their dependency from claim 17." *Id.* The PTO issued a second Ex Parte Reexamination Certificate for the '656 patent on October 30, 2007. ('656 C2).

## D.    The '708 Patent

On September 21, 2004, Drs. Brewlow and Rosenfeld applied for a patent for a "telecommunications network for remote patient monitoring" to supplement the '656 patent. ('708 Patent, p. 1). Thereafter, the PTO issued the '708 patent on August 14, 2007. *Id.* Visicu alleges Cerner has infringed and is infringing claims 1, 2, 32, 63, and 87 of the '708 patent. (Wade Rpt., p. 96).

## E.    The Alleged Trade Secrets

Visicu claims Cerner misappropriated five documents: (1) the Gap Analysis; (2) the Future Features List; (3) a document given to former Cerner employee, Vicki Anderson, to use in developing Cerner's INET Virtual ("Anderson Document"); (4) the eLert Guide; and (5) the eICU Operations Guide. (Henkind Rpt., ¶¶33A-B, 54-55; June 8, 2009, Henkind Supp. Rpt., pp. 3-5). Visicu's expert, Dr. Steven Henkind, opines that Visicu's asserted trade secrets are extraordinarily useful from a competitive perspective, have significant economic value, and were not generally known, nor readily ascertainable by proper means. (Henkind Depo., 143:11-144:3, 167:12-168:22, 188:14-189:16, 197:11-15, 236:14-16, 237:17-21, 239:1-240:2; Henkind Rpt., ¶¶56, 72-73, 75, 77).

Dr. Henkind stated he believes Visicu's trade secrets have value because, if used as Visicu alleges, they saved Cerner time in designing its system and identified functionalities that had already been vetted and proven in the industry, thus helping it avoid "dead ends." (Henkind Rpt., ¶¶72-73). Dr. Henkind further opined that even if Cerner had not incorporated any confidential Visicu

Case 4:04-cv-01033-GAF    Document 421    Filed 10/26/09    Page 9 of 29

information into the design, development, implementation, or marketing of its INET Virtual product, the Visicu information would still have been extraordinarily valuable because Cerner used it to make more effective and efficient competitive decisions with respect to market positioning and future production direction. *Id.* at ¶75.

1.    *The Gap Analysis and Future Features List*

Visicu claims the Gap Analysis and the Future Features List as combination trade secrets. (Henkind Supp. Rpt., Sec. II, ¶2). The Gap Analysis was a comprehensive list of the features contained in Visicu's then current eICU remote monitoring system. (5/21/01 Argus/Cerner Feature-Level Gap Analysis ("Gap Analysis"); 6/4/01 Gap Analysis; Bowerman Depo., 35:2-36:4, 53:9-12). The Future Features List named the features Visicu was developing for future releases of its eICU remote monitoring system.[8] (Future Features List; Bowerman Depo., 64:9-21, 66:8-18). Both the Gap Analysis and the Future Features List bore the Visicu logo on the top of each page and a note on the bottom of each page, which stated "CONFIDENTIAL–This document contains confidential and proprietary property of Visicu." (5/21/01 Gap Analysis; 6/4/01 Gap Analysis; 6/4/01 Future Features List).

During its discussions with Cerner, Visicu shared its Future Features List and at least two versions of the Gap Analysis. *Id.* The parties used the Gap Analysis during the discussions to determine what features Cerner's system was lacking. (6/4/01 Gap Analysis; Comerchero Depo., 249:3-14; Super Depo., 349:19-350:11). Cerner marked features that it had with a "Y" and features that it lacked with a "N." (Super Depo., 349:19-350:11). On the June 4 version of the Gap

---

[8]Visicu eventually incorporated all but one of the functionalities on the Future Features List into its product. (Bowerman Depo., 66:15-68:9).

Analysis, Cerner identified 23 specific items and classes of functionality that Cerner's product lacked at that time. (6/4/01 Gap Analysis; Henkind Rpt., ¶60, App. D).

Evidence exists Cerner used the Gap Analysis and the Future Features List in developing INET Virtual. Dr. Henkind analyzed the 23 items on the Gap Analysis, which Cerner indicated it did not have in 2001, to determine if these items had been incorporated into Cerner's INET Virtual system. (Henkind Rpt., App. D). Dr. Henkind determined all but five of the 23 items had been incorporated into Cerner's system. (Henkind Rpt., App. D). Further evidence exists that implies Cerner used the Gap Analysis and the Future Features List in its research and development efforts for INET Virtual. (CERN017059-60 (wherein Cerner identified "five significant features" that Visicu designed); CERN057353-54 (Cerner's Planned Enhancements for INET over the next three years," dated August 2001, incorporates four of the five significant features into Cerner's product plans); CERN057223-27 (INET Intensive Care Integration Strategic Plan 2002 continues to incorporate those four Visicu Features into Cerner's plan); Henkind Rpt., ¶¶39-44). Additionally, Cerner employee, Amy Francois, emailed a document entitled "INET-needs analysis" that specifically references the Gap "Analysis done on Visicu analysis [sic] completed in 2001" and incorporates several items, word-for-word, from the Gap Analysis. (CERN078568-69). Ms. Francois admitted she "did copy and paste language from document to document to save time," although she could not recall if she had done so with the INET-needs analysis. (Francois Depo., 117:5-13). Cerner eventually removed its reference to Visicu from its INET-needs analysis but retained the Gap Analysis items. (CERN011114-15).

Dr. Henkind opined the Gap Analysis and the Future Features List "provided extraordinarily deep insight into Visicu's product functionality including: (a) An overall 'gestalt' for Visicu's

11

product; (b) a detailed specification of key features and function; [and] (c) future product direction." (Henkind Rpt., ¶71). He further opined "the depth and breadth of this information far exceeded anything which could be 'pieced together' from publicly available sources" and "could not possibly have been constructed by non-Visicu staff using publicly available information." *Id.*

Visicu's product manager, David Bowerman, considers the Gap Analysis and the Future Features List absolutely proprietary, confidential information that provided the roadmap of how to build Visicu's system. (Bowerman Depo., 64:9-65:10, 204:3-15). Mr. Bowerman further testified that he would never have given the Gap Analysis to anyone outside of Visicu without a NDA or a directive from one of the company's founders. *Id.* at 204:16-19, 216:10-15, 218:16-22.

    2.    *The Anderson Document*

Vicki Anderson, former Cerner employee, testified that Cerner obtained a 25-30 page Visicu document ("Anderson Document") from Borgess that showed Visicu's eICU remote monitoring system's core functionalities. (Anderson Depo., 21:5-23:7, 25:15-26:5; Rogers Depo., 68:16-69:3). However, discovery in this case has not produced this document. According to Ms. Anderson, the Anderson Document provided information "mostly centering around the processes, the video assessment capabilities to have audio and video capabilities into the patient's bedside, to have the ability to ring a doorbell to let the staff know that we were cameraing [accessing via video camera] into a room." (Anderson Depo., 21:5-23:7, 25:15-26:5). Ms. Anderson testified the Anderson Document bore the Visicu logo and was clearly marked as "confidential" and "proprietary." (Anderson Depo., 24:15-25:2). Ms. Anderson further stated the document contained information describing functionalities unique to Visicu's remote monitoring system, which Ms. Anderson then included in Cerner's INET Virtual design. (Anderson Depo., 26:6-15). Ms. Anderson also testified

Case 4:04-cv-01033-GAF   Document 421   Filed 10/26/09   Page 12 of 29

that "[t]here was no secret made in team discussions that the basis of the design for the Virtual ICU Cerner was developing originated in the Visicu document in conjunction with independent ideas that had come through the INET team." (Anderson Depo., 28:24-29:4).

      *3.     The eLert Guide*

      In 2007, Cerner obligated itself to "[r]eplace VisiCU [sic] within the Methodist virtual monitoring bunker, providing equivalent or greater functionality" at Clarian Health Partners ("Clarian"). (CERN080898). Cerner enlisted Cardiopulmonary Corporation ("CPC") to develop a software platform for use at Clarian. (Blodgett Depo., 45:17-46:7). Specifically, Cerner partnered with CPC to replicate Visicu's alert buttons, called eLert, that were used at Clarian by bedside caregivers to notify the clinician in the remote command center of a problem. (CERN080899). INET Virtual did not have this alert functionality. (Kuehnert Depo., 45:20-23).

      Cerner employee, Kathy Kuehnert, asked Clarian employees, Cassie Oakes and Brion Carter, to send her documents regarding the eLert "call button" that Visicu was providing Clarian. (Kuehnert Depo., 36:3-38:9; CERN250474; CERN257838). Ms. Oakes then sent a Clarian-produced document, which included text copied word-for-word from a confidential and proprietary Visicu document regarding the eLert functionality, to Ms. Kuehnert, who then forwarded it to several CPC employees. (CPC10169-72; VIS0578032-88; Henkind Supp. Rpt., pp. 4-5). However, Visicu provides no evidence indicating Cerner knew Clarian had copied Visicu's confidential and proprietary document in creating the document sent to CPC.

      The Visicu document Visicu asserts the Clarian-produced document is copied from is entitled "V0003A AXIS 241SA Video Server and eLert: Configuration, Maintenance, and Troubleshooting Guide" (hereinafter "eLert Guide"). (VIS0578032-88). The eLert Guide has

Visicu's logo and a "CONFIDENTIAL" watermark on each page. *Id.* It also contains, on the bottom of the first page, the following note: "Visicu, Inc. proprietary rights are included in the information disclosed herein. Neither this document nor the information disclosed herein shall be reproduced or transferred to other documents or used or disclosed to others for manufacturing or for any other purpose except as specifically authorized in writing by Visicu, Inc." *Id.* Every subsequent page states: "Visicu, Inc. Confidential and Proprietary. Permission to reproduce is required. Visicu retains all rights to the information provided by this service, including, but not limited to, the right of distribution." *Id.* There were no confidentiality markings on the Clarian-produced document. (CPC10169-72).

### 4. *The eICU Operations Guide*

The eICU Operations Guide describes Visicu's work flows for its remote monitoring system and had Visicu's logo on the top of each page and bore a note on the bottom of each page that stated "CONFIDENTIAL–This document contains confidential and proprietary property of Visicu." (VIS0194300-32). Visicu claims Cerner used this document to create its own Virtual ICU Policies and Procedures, specifically that Cerner copied the sequence of policies and procedures from three sections in Visicu's eICU Operations Guide – entitled Cardiac/Respiratory Arrest Situations (Code), Patient Death, and Downtime Procedures – into three sections in Cerner's Virtual ICU Policies and Procedures – entitled Emergency Events/Codes/Cardiopulmonary Arrest, Patient Expiration, and Procedure in the Event of Downtime – respectively. (VSOF-TS,[9] ¶36). While similarities between the documents exist, Visicu provides no further evidence that Cerner was in possession of or

_____

[9]Visicu's Proposed Statement of Material Facts in Support of its Suggestions in Opposition to Cerner's Motion for Partial Summary Judgment on Visicu's Sixth Counterclaim for Alleged Misappropriation of a Trade Secret. (Doc. #288).

Case 4:04-cv-01033-GAF   Document 421   Filed 10/26/09   Page 14 of 29

otherwise obtained the eICU Operations Guide. Further, while similarities exist, it should be noted that different verbiage is used throughout the two documents and Visicu's eICU Operations Guide is far more detailed than Cerner's allegedly misappropriated document. (*Compare* eICU Operations Guide *with* Virtual ICU Policies and Procedures).

## II.    Standard

"Summary judgment is appropriate in a patent case, as in other cases, when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Nike Inc. v. Wolverine World Wide, Inc.*, 43 F.3d 644, 646 (Fed. Cir. 1994). However, "[m]any, if not most, suits for patent infringement give rise to numerous and complex fact issues, rendering those suits inappropriate for summary disposition." *Union Carbide Corp. v. Am. Can Co.*, 724 F.2d 1567, 1571 (Fed. Cir. 1984). An issue of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Where the party opposing summary judgment raises a genuine issue of material fact by proffering expert testimony in conflict with the positions of the moving party, summary judgment is properly denied. *See, e.g., Metro. Life Ins. Co. v. Bancorp Serv., L.L.C.*, 527 F.3d 1330, 1338-39 (Fed. Cir. 2008) (holding the "conflict in [expert] declarations created a genuine issue of material fact that made summary judgment inappropriate").

In determining whether summary judgment is appropriate, "credibility determinations may not be made, and the evidence must be viewed favorably to the non-movant, with doubts resolved and reasonable inferences drawn in the non-movant's favor." *Wanlass v. Fedders Corp.*, 145 F.3d 1461, 1463 (Fed. Cir. 1998). However, "[w]here a movant has supported its motion with affidavits or other evidence which, unopposed, would establish its right to judgment, the non-movant may not

15

rest upon general denials in its pleadings or otherwise, but must proffer countering evidence sufficient to create a genuine factual dispute." *Sweats Fashions, Inc. v. Pannill Knitting Co.*, 833 F.2d 1560, 1562 (Fed. Cir. 1987).

## III.    Analysis

### A.    *Cerner's Motion for Summary Judgment of Noninfringement (Doc. #269)*

"Determination of patent infringement requires a two-step analysis: (1) the scope of the claims must be construed; and (2) the allegedly infringing device must be compared to the construed claims." *Mars, Inc. v. H.J. Heinz Co.*, 377 F.3d 1369, 1373 (Fed. Cir. 2004). To establish literal infringement, every limitation of the patent claim must be present in the accused device. *Wenger Mfg., Inc. v. Coating Mach. Sys., Inc.*, 239 F.3d 1225, 1231 (Fed. Cir. 2001). If a product does not literally infringe upon the express terms of a patent claim, such product may nonetheless be found to infringe if there is "equivalence" between the elements of the accused product and the claimed elements of the patented invention. *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 21 (1997) (citation omitted). Infringement, whether literal or by equivalents, is a question of fact. *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1125 (Fed. Cir. 1985) (citing *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605 (1950)).

Here, disputes of material facts preclude a summary finding of literal infringement. Disputed facts as to infringement by equivalence also remain, but Cerner asserts prosecution history estoppel bars a finding of equivalence. When, during the prosecution of a patent, the patentee amends or narrows a claim to distinguish it from prior art, prosecution history estoppel is presumed to limit the range of equivalents protected by the amended claim. *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1578 (Fed. Cir. 1995). Nonetheless, the patentee can establish the particular

16

equivalent is not surrendered by an amendment if: (1) the equivalent was not foreseeable at the time of the application; (2) the rationale underlying the amendment bears no more than a tangential relation to the equivalent in question; or (3) some other reason exists that suggests the patentee could not reasonably have been expected to describe the insubstantial substitute in question. *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co. ("Festo VIII")*, 535 U.S. 722, 740-41 (2002). Whether prosecution history estoppel applies is a matter of law to be determined by the Court. *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 39, n.8 (1997).

Cerner first argues Visicu surrendered any recourse for equivalents of claim 17 of the '656 patent when it amended this claim to read "determination if intervention is warranted . . . ~~is directed from~~ occurs in an automated fashion at the remote command center." Cerner contends this amendment required the physical location of the rules engine to be confined to the remote command center. The Court finds Cerner's argument unpersuasive. As Visicu explained when it amended the claim, the language was changed "to further clarify that the monitoring and intervention functions of the claimed embodiments are automated," not to limit the physical location of a rules engine to a remote command center. While the amendment does narrow the claim to automated systems, the rationale in using the term "at" rather than "from" bears no more than a tangential relation to the alleged equivalent.

For the same reasons, claim 17 was not narrowed to require the database to be physically stored in the remote command center. When cancelling prior claim 25 and adding new claim 46[10] during the original prosecution of the '656 patent, Visicu was not distinguishing prior art on the grounds that it disclosed a database physically housed outside the remote command center, but rather

---

[10]Renumbered as claim 17.

that the invention was computer-driven instead of human-based. Accordingly, "the reason for the narrowing amendment was peripheral, or not directly related, to the alleged equivalent." *Regents of Univ. of Cal. v. Dakocytomation Cal., Inc.*, 517 F.3d 1364, 1378 (Fed. Cir. 2008).

Cerner's remaining arguments merely rehash issues decided during claim construction and the Court will not entertain them any further. *See Ciena Corp. v. Corvis Corp.*, 334 F. Supp. 2d 598, 608 (D. Del. 2004) (rejecting defendant's "attempts to distinguish its accused system reargue claim construction issues which were already rejected by the Court"); *Abbey v. Bill Ussery Motors, Inc.*, 74 F. Supp. 2d 1221, 1222 (S.D. Fla. 1999) (same). For these reasons, Cerner's Motion for Summary Judgment of Noninfringement is DENIED.[11] [12]

## B.    *Cerner's Motion for Summary Judgment of Invalidity (Doc. #244)*

A patent is invalid if the subject matter sought to be patented is obvious from prior art existing at the time of the application. 35 U.S.C. §103(a). *See also Graham v. John Deere Co.*, 383 U.S. 1, 14 (1966). "The ultimate judgment of obviousness is a legal determination." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 427 (2007) (citing *Graham*, 383 U.S. at 17). Nevertheless, whether an invention is obvious depends on underlying factual determinations. *Ryko Mfg. Co. v. Nu-Star, Inc.*, 950 F.2d 714, 716 (Fed. Cir. 1991). The Supreme Court has articulated the following four

---

[11]Cerner also asserts Visicu's claims of direct infringement under the joint liability theory must fail because Cerner was not the mastermind behind the infringement. "[W]here the actions of multiple parties combine to perform every step of a claimed method, the claim is directly infringed only if one party exercises 'control or direction' over the entire process such that every step is attributable to the controlling party, i.e., the 'mastermind.'" *Muniauction, Inc. v. Thomson Corp.*, 532 F.3d 1318, 1329 (Fed. Cir. 2008). Whether Cerner was the "mastermind" is a question of fact best suited for the jury. *See id.*

[12]For the same reasons its prosecution history estoppel argument fails, Cerner's "all elements rule" and "vitiation doctrine" arguments also fail.

18

factors for courts to assess when determining whether an invention is obvious: (1) the level of ordinary skill in the art; (2) the scope and content of the prior art; (3) the differences between the prior art and the claims in dispute; and (4) any objective evidence of nonobviousness, including the so-called secondary considerations. *Graham*, 383 U.S. at 17-18. Here, genuine issues of material fact remain as to each of these factors. Accordingly, Cerner's Motion for Summary Judgment of Invalidity is DENIED.[13]

## C.    *Cerner's Motion for Summary Judgment of Intervening Rights (Doc. #237)*

The statutory doctrine of intervening rights under 35 U.S.C. §§ 252 and 307(b) provides that when a patent has been reexamined by the PTO, a patentee is precluded from collecting damages for infringement that occurred before issuance of the reexamination certificate unless the original and reexamined claims are "substantially identical." *See* 35 U.S.C. §§ 252 and 307(b); *Laitram Corp. v. NEC Corp.*("*Laitram IV*"), 163 F.3d 1342, 1346 (Fed. Cir. 1998). "Reexamined claims are 'identical' to their original counterparts if they are 'without substantive change.'" *Laitram IV*, 163 F.3d at 1346 (citing *Seattle Box Co. v. Indus. Crating & Packing*, 731 F.2d 818, 827-28 (Fed.Cir.1984)). To determine if a claim is without substantive change, the Court must examine whether the scope of the original claim is identical to that of the reexamined claim, "not merely whether different words are used." *Id.*

When determining if the scope of the patent is identical, the Court examines the claims, not the written description, of the patent. *Laitram IV*, 163 F.3d at 1347. A plain reading of original and reexamined claims may establish that the claims are of a different scope. *Id.* at 1348. The prosecution history should be consulted as necessary to confirm what the plain reading

---

[13]Visicu's Motion for Leave to File a Surreply (Doc. #368) is DENIED as moot.

19

demonstrates. *Id.* Additionally, "it is difficult to conceive of many situations in which the scope of a rejected claim that became allowable when amended is not substantively changed by the amendment." *Id.* However, there is no *per se* rule to that effect. *Id.* The determination of whether reexamined patent claims are identical to their original counterparts is a question of law and therefore is appropriate for summary judgment. *Id.* at 1347; *Westvaco Corp. v. Int'l Paper Co.*, 991 F.2d 735, 741 (Fed. Cir. 1993).

Here, a plain reading of claim 17 of the '656 patent demonstrates the scope of the claim did not remain identical following the two reexaminations. With the first amendment, Visicu made three substantive changes to claim 17, which narrowed its scope: (1) the rules engine must operate "continuously"; (2) the rules engine must "search for patterns of data indicative of a medical condition of a patient" instead of simply monitoring the medical conditions of patients; and (3) the monitoring and determination of whether intervention is warranted must occur remotely. Furthermore, as the PTO explicitly noted, these amendments allowed claim 17 to "define over the cited prior art patents and printed publications." These changes did not merely clarify, as Visicu contends, but rather narrowed claim 17's scope. *See Atl. Constr. Fabrics, Inc. v. Metrochem, Inc.*, No. C03-5645BHS, 2008 WL 4414763, at *5 (W.D. Wash. Sept. 24, 2008) (finding a limiting amendment of a claim rejected by the PTO in light of prior art was not clarifying).

Likewise, the amendment to claim 17 after the second reexamination resulted in a substantive change. The second amendment narrowed the scope by requiring the monitoring and determination to occur in an automated fashion and is not merely clarifying.[14] Again, the PTO noted

_____

[14]As stated in Section II.A., *supra*, the terminology change of "from" to "at" is inconsequential within the meaning of claim 17 and therefore is not substantive.

in its reasons for allowance that the second reexamined claim 17 "ha[s] been amended to overcome the prior art rejections set forth in this reexamination proceeding." Therefore, second reexamined claim 17 and its dependents were substantively changed and are not substantially identical to their first reexamined counterparts.

Because claim 17's scope was not identical to its preceding counterpart following the two amendments, Cerner is relieved from potential liability during the period before the claims issued from the second reexamination. 35 U.S.C. §§ 252 and 307(b); *Laitram IV*, 163 F.3d at 1346 ("If substantive changes have been made to the original claims, the patentee is entitled to infringement damages only for the period following the issuance of the reexamination certificate."). For these reasons, the Court GRANTS Cerner's Motion for Summary Judgment of Intervening Rights.

### D. *Cerner's Motion for Partial Summary Judgment of No Willful Infringement (Doc. #241)*

Whether Cerner willfully infringed upon Visicu's patents is a question of fact. *Minn. Mining & Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc.*, 976 F.2d 1559, 1580 (Fed. Cir. 1992). Because material factual disputes remain, Cerner's Motion for Partial Summary Judgment of No Willful Infringement is DENIED.

### E. *Cerner's Motion for Partial Summary Judgment on Visicu's 6th Counterclaim for Alleged Misappropriation of a Trade Secret (Doc. #230)*

As previously stated, Visicu alleges five documents – the Gap Analysis, the Future Features List, the Anderson Document, the eLert Guide, and the eICU Operations Guide – are trade secrets that Cerner misappropriated. As a threshold matter, the Court must first determine if these

Case 4:04-cv-01033-GAF   Document 421   Filed 10/26/09   Page 21 of 29

documents[15] are trade secrets as a matter of law. *Lyn-Flex W., Inc. v. Dieckhaus*, 24 S.W.3d 693, 698 (Mo. Ct. App. 1999). Under Missouri law, a trade secret is defined as

> [I]nformation, including but not limited to, technical or nontechnical data, a formula, pattern, compilation, program, device, method, technique, or process, that:
>
> > (a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use; and
> >
> > (b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Mo. Rev. Stat. § 417.453(4).

In determining whether the information involved in a given case constitutes a trade secret under Missouri Uniform Trade Secret Act, Mo. Rev. Stat. §§ 417.450, *et seq.* ("MUTSA"), courts have utilized the following factors to provide guidance:

> (1) the extent to which the information is known outside of [the] business;
>
> (2) the extent to which it is known by employees and others involved in [the] business;
>
> (3) the extent of measures taken by [the business] to guard the secrecy of the information;
>
> (4) the value of the information to [the business] and to [its] competitors;
>
> (5) the amount of effort or money expended by [the business] in developing the information;

---

[15]To the extent Visicu claims other information – including other architecture and technical design, workflow, pricing structure, and sales strategy – constitutes trade secrets, Visicu abandoned such claims by failing to address them in its Response Brief. *See Meyers v. Starke*, 420 F.3d 738 (8th Cir. 2005). Accordingly, Cerner's Motion is GRANTED with respect to the same.

(6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Am. Family Mut. Ins. Co. v. Mo. Dep't of Ins.*, 169 S.W.3d 905, 909-10 (Mo. Ct. App. 2005) (citation omitted). "The existence of a trade secret is a conclusion of law based on the applicable facts." *Id.* at 910 (citation omitted). However, if the facts the Court uses to determine whether information constitutes a trade secret are disputed, the finder of fact must first resolve those disputes. *See, e.g., Lyn-Flex*, 24 S.W.3d at 698-99 (evidence presented a jury question as to whether a price book was a trade secret for purpose of a misappropriation claim).

Pursuant to MUTSA, misappropriation of a trade secret occurs when a person uses the trade secret of another without express or implied consent if that person: (a) used improper means to acquire knowledge of the trade secret; (b) knew or had reason to know that it was a trade secret and that knowledge had been acquired by accident or mistake; or (c) at the time of the use, knew or had reason to know that knowledge of the trade secret was (1) derived from or through a person who had utilized improper means to acquire it, (2) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or (3) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use. Mo. Rev. Stat. § 417.453(2)(b). Whether a trade secret has been misappropriated is a question of fact. *See Insituform Techs., Inc. v. Reynolds, Inc.*, 398 F. Supp. 2d 1058, 1063-64 (E.D. Mo. 2005). *See also* 86 C.J.S. *Torts* § 117 (2009) ("In an action for misappropriation of trade secrets . . . whether a trade secret has been misappropriated . . . [is a] question[] of fact.").

23

1. *Gap Analysis and Future Features List*

"In some cases, a novel or unique combination of elements may constitute a trade secret." *Strategic Directions Group, Inc. v. Bristol-Myers Squibb Co.*, 293 F.3d 1062, 1065 (8th Cir. 2002) (citation omitted). However, "mere variations on widely used [information] cannot be trade secrets." *Id.* (alteration in original). Here, the unique combination of the features listed on both the Gap Analysis and the Future Features List are more than just a mere variation on widely used information.

Visicu made reasonable efforts to guard the secrecy of the Gap Analysis and the Future Features List. If reasonable efforts have been made to maintain confidentiality, then the information's status as a trade secret may be upheld. *See Surgidev Corp. v. Eye Tech., Inc.*, 828 F.2d 452, 455 (8th Cir.1987) ("Only reasonable efforts, not all conceivable efforts, are required to protect the confidentiality of putative trade secrets."). When disseminating the two documents, Visicu required NDA's and labeled the documents as confidential and proprietary information. Additionally, while Visicu made sales presentations for its eICU solution and attended trade shows, Visicu did not make handouts available absent a NDA.

Further, evidence exists indicating the high value and limited public availability of the information contained in the Gap Analysis and the Future Features List. Dr. Henkind testified a competitor would find the documents of high value in developing a competitive product. While a sales power-point presentation was available on the Internet, it was merely a cursory overview of Visicu's product and did not provide the level of detail contained in the Gap Analysis and the Future Features List. Moreover, the presentation was not made available on the Internet until 2004, after Cerner purportedly misappropriated the Gap Analysis and the Future Features List, and is no longer

available.  For these reasons, the Court finds the Gap Analysis and the Future Features List are trade secrets.

Material factual disputes remain as to whether Cerner used the Gap Analysis and/or the Future Features List in the research and development of INET Virtual without Visicu's consent. *See 02 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 399 F. Supp. 2d 1064, 1072 (N.D. Cal. 2005) (finding one "uses" a trade secret when one considers the trade secret in conducting research and development, experimentation, manufacturing, production, marketing, or solicitation of customers); *Garth v. Staktek Corp.*, 876 S.W.2d 545 (Tex. App. 1994) (holding that "using a trade secret to produce a design for which a patent application is then submitted" and "using a product design to procure financing for development of that product" constitute use).    *See also Vermont Microsystems, Inc. v. Autodesk, Inc.*, 88 F.3d 142, 147 (2d Cir. 1996) (affirming judgment of misappropriation of trade secret comprising a combination of computer software elements because defendant's product was "substantially derived from the architecture" of plaintiff's software, though not necessarily "identical").

Despite Cerner's denial to the contrary, Visicu has pointed to evidence in the record that demonstrates, at the very least, a possibility that Cerner used the Gap Analysis and the Future Features List for research and development purposes.  For example, Ms. Francois sent a document via email that was identical in content and format to a portion of the Gap Analysis.  Ms. Francois went on the testify that she cut and pasted text from document to document to save time. Additionally, several features on the Gap Analysis and the Future Features List that Cerner did not have prior to discussions with Visicu were incorporated into Cerner's product following acquisition of these documents.  These facts create a material dispute as to Cerner's assertion that it did not

misappropriate these documents. Because factual disputes remain as to whether Cerner misappropriated Visicu's Gap Analysis and Future Features List, summary judgment is DENIED as to these two trade secrets.[16]

2.      *The Anderson Document*

Cerner argues the Anderson Document is inadmissible evidence and cannot be used to defeat its Motion. However, the hearsay rule does not apply because Visicu is not attempting to prove the truth of the matters asserted in the document. Fed. R. Evid. 801. Rather, Visicu is attempting to establish the contents of the document and that the document is a trade secret.

Further, Rule 1004 of the Federal Rules of Evidence provides that an original is not required and other evidence of the contents of a writing is admissible if the original was lost or destroyed. Ms. Anderson provided testimony regarding the contents of the Anderson Document, which was purportedly in Cerner's possession while Ms. Anderson was employed there. When considering a summary judgment motion, the Court does not weigh the credibility of a witness. *Wanlass*, 145 F.3d at 1463. As such, the Court considers Ms. Anderson's testimony in the light most favorable to Visicu, meaning Cerner acquired a Visicu document marked as confidential and proprietary from a Visicu client. Because Cerner possessed such document at one time but now does not, the Court presumes the document is either lost or destroyed and therefore, Ms. Anderson's testimony regarding the contents of the Anderson Document is admissible for purposes of this Motion. Because Ms. Anderson's testimony supports that the document contained confidentiality markings

---

[16]Cerner's independent development argument likewise fails. While Cerner may have independently developed some features listed on the Gap Analysis and Future Features List, evidence exists that INET Virtual was developed with the aid of these documents.

26

and was of high value to Cerner in developing INET Virtual, the Anderson Document must be considered a trade secret.

Evidence also exists that Cerner misappropriated the Anderson Document. Specifically, Cerner did not have Visicu's consent before using the Anderson Document, which Cerner knew or had reason to know was derived from or through a person who owed a duty to Visicu to maintain its secrecy or limit its use. Mo. Rev. Stat. § 417.453(2)(b). Accordingly, summary judgment is DENIED with respect to the Anderson Document.

### 3.    The eLert Guide

As with the Gap Analysis, the Future Features List, and the Anderson Document, the eLert Guide is also a trade secret. Cerner argues Visicu either failed to prove this document has any value or only provided conclusory evidence of its value. The Court disagrees. MUTSA requires information to have some independent economic value in order for that information to qualify as a trade secret. Mo. Rev. Stat. § 417.453(4)(a); *Am. Family Mut. Ins. Co. v. Mo. Dep't of Ins.*, 169 S.W.3d 905, 910 (Mo. Ct. App. 2005). When viewing his testimony and expert report in a light most favorable to Visicu, Dr. Henkind provides the basis for his conclusions that the eLert Guide is valuable in the design, development, and implementation of competing operational work flows. Additionally, as with the Gap Analysis and the Future Features List, Visicu took appropriate measures to maintain the secrecy of the eLert Guide by marking it as confidential and/or proprietary and requiring NDA's. Accordingly, this document qualifies as a trade secret.

Visicu has also provided evidence that Cerner acquired contents of the eLert Guide through improper means. "Breach or inducement of a breach of a duty to maintain secrecy" is included in the definition of "improper means." Mo. Rev. Stat. § 417.453(1). Here, Visicu produced an email

27

sent from a Cerner employee to a Clarion employee requesting any documentation with details of the "call button." Given that Cerner knew Clarion currently used Visicu's eICU remote monitoring system and that the "call button" was a part of this system, a fact finder might reasonably believe Cerner induced Clarion to send information contained in the eLert Guide, which would thereby breach Clarion's duty to maintain secrecy owed to Visicu. The Court therefore DENIES summary judgment on this point.

### 4. The eICU Operations Guide

The eICU Operations Guide also is a trade secret. Like the eLert Guide, Cerner argues Visicu either failed to argue the eICU Operations Guide has any value or only provided conclusory evidence of the its value. The Court finds these arguments unpersuasive for the same reasons the Court found them unpersuasive as to the eLert Guide.

However, unlike the eLert Guide, Visicu provides no evidence, outside its assertions that the sequence of three out of 85 sections are similar, that Cerner ever possessed, acquired, or derived the eICU Operations Guide or the information contained therein. This is fatal to Visicu's misappropriation claim of the same. *See* Mo. Rev. Stat. § 417.453(2).

For the aforementioned reasons, Cerner's Motion is GRANTED with regard to the eICU Operations Guide and DENIED with regard to the other trade secrets.

### F. Visicu's Motion for Summary Judgment of No Inequitable Conduct (Doc. #232)

A patent is unenforceable if it is procured by inequitable conduct. *Larson Mfg. Co. of S.D. v. Aluminart Prods. Ltd.*, 559 F.3d 1317, 1326 (Fed. Cir. 2009). "To successfully prove inequitable conduct, the accused infringer must present evidence that the applicant (1) made an affirmative misrepresentation of material fact, failed to disclose material information, or submitted false material

28

information, and (2) intended to deceive the [PTO]." *Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1365 (Fed. Cir. 2008) (internal quotation marks and citations omitted). "Both intent and materiality are questions of fact, and must be proven by clear and convincing evidence." *Scanner Techs. Corp. v. ICOS Vision Sys. Corp. N.V.*, 528 F.3d 1365, 1374 (Fed. Cir. 2008). Here, both the materiality of certain prior art and Visicu's intent are in dispute. Accordingly, the Court DENIES Visicu's Motion.

## CONCLUSION

Genuine issues of material fact preclude summary judgment on Cerner's Motions regarding non-infringement (Doc. #269), invalidity (Doc. #244), and willful infringement (Doc. #241) as well as Visicu's Motion regarding inequitable conduct (Doc. #232). Additionally, questions of fact remain as to the misappropriation of four of Visicu's five trade secrets and therefore Cerner's Motion regarding the same (Doc. #230) is GRANTED in part and DENIED in part. However, as a matter of law, amendments made to claim 17 of the '656 patent substantively changed its scope and therefore it is not substantially identical to the original claim. Accordingly, Cerner's Motion regarding intervening rights (Doc. #237) is GRANTED.

**IT IS SO ORDERED.**

s/ Gary A. Fenner
Gary A. Fenner, Judge
United States District Court

DATED: October 26, 2009

29